## APPEAL OF ARROWHEAD MILLS, INC.

### Docket No. 3214.     Decided November 9, 1926.

PAID-IN SURPLUS.—The taxpayer claimed a paid-in surplus under the provisions of section 326(a)(2) of the Revenue Act of 1918. *Held*, that the evidence respecting the character and value of the property paid in, as well as the opinion testimony concerning such value, is too general and indefinite to warrant the Board in finding a definite value in excess of the amount for which stock was issued, and that the claim for paid-in surplus is not sustained.

*Lawrence A. Baker, Esq.*, and *J. Edward Murphy, Esq.*, for the petitioner.

*A. H. Fast, Esq.*, for the Commissioner.

The petitioner complains of a deficiency letter, dated February 25, 1925, asserting deficiencies in tax for the fiscal year ended April 30, 1919, in the amount of $604.41, and for the fiscal year ended April 30, 1920, in the amount of $16,104.74, and showing an overassessment for the fiscal year ended April 30, 1921, in the amount of $4,211.76, and prays for a redetermination of the deficiencies in tax there set forth. The issue in controversy is the actual cash value of a sulphite mill on May 10, 1916, when paid in to the taxpayer corporation for stock, and whether the taxpayer may include in its invested capital a paid-in surplus under the provisions of section 326(a)(2) of the Revenue Act of 1918.

### FINDINGS OF FACT.

The taxpayer is a New York corporation with its principal office at Fulton. It was incorporated in April, 1916, with an authorized

capital stock of $250,000, consisting of 2,500 shares with a par value of $100 each.

The Battle Island Paper Co., a New York corporation, was organized in 1901. Soon after the company was organized it constructed a sulphite mill on an island in the Oswego River about two miles north of the Town of Fulton. The power for operation of the mill was derived from what was known as the Battle Island Dam, located about one and one-quarter miles below the mill. In 1912 the property in and around the dam was appropriated by the State of New York for barge canal purposes, and a dam known as the Minetto Dam was built by the State two and one-half miles below the Battle Island Dam. This dam was raised to such a height that the Battle Island Dam was submerged and the water power destroyed.

In July, 1914, the Battle Island Paper Co. went into bankruptcy. The actual cost of the mill "at the time of the bankruptcy" was $392,294.13. The land on which the mill was located cost $5,500. On November 27, 1915, the mill, including land, was sold by the trustees in bankruptcy to S. Gay Daley for $35,000. Subsequently, F. A. Emerick, through his agent, Nelson T. Whitaker, entered into negotiations with Daley for the purchase of the property. The purchase was concluded on December 24, 1915, when Daley and his wife conveyed the property to Whitaker for a consideration of $50,000. At that time the mill had been idle for approximately two years because it had no power on which to operate.

On the 16th day of February, 1916, Whitaker, again acting as agent for F. A. Emerick, negotiated a lease with the Granby Pulp & Paper Co., for water power sufficient to generate 1,200 horse-power of electricity, for which the lessee was to pay $25 per horse-power per year. The lease was for a period of one year from the date on which the lessee should begin to use the power and was renewable from year to year for nineteen successive years on the same terms. The majority of the stock of the Granby Pulp & Paper Co. was owned by F. A. Emerick, for whom Whitaker acted as agent. The dam of the Granby Pulp & Paper Co. was located two and one-half miles above the Battle Island Mill.

On March 20, 1916, a permit was issued, on certain conditions, to Nelson L. Whitaker, by the Superintendent of Public Works of the State of New York, whereby Whitaker was permitted to construct and maintain transmission lines along the river north of the City of Fulton to the mill property. The conditions were accepted by Whitaker on March 21, 1916. On March 13, 1916, a resolution was passed by the Board of Public Works of the City of Fulton granting permission to Nelson T. Whitaker to construct and maintain a

conduit for the purpose of conducting electrical current through the City of Fulton.

On May 10, 1916, the sulphite mill at Battle Island was conveyed to the taxpayer and $50,000 of the capital stock of the taxpayer was issued to F. A. Emerick therefor. On May 12, 1916, the permit issued to Whitaker by the State of New York authorizing construction and maintenance of the transmission lines was transferred to the taxpayer. On May 15, 1916, Whitaker assigned to the taxpayer the permit issued to him by the City of Fulton, and on the same day he assigned to the taxpayer the lease of water power from the Granby Pulp & Paper Co. These assignments recited as consideration one dollar and other valuable consideration.

The only other power available for the operation of the sulphite mill was owned by the Niagara Company and could be obtained only by the payment of a power charge, a service charge, and a peak load charge. Inasmuch as the operation of the sulphite mill would be very irregular, the cost of power from the Niagara Company would be prohibitive, since it would be approximately $100 per horse-power per year.

Following the organization of the taxpayer corporation, and between May 19 and October 23, 1916, F. A. Emerick purchased and paid cash for $108,000 par of the taxpayer corporation's stock, and other persons purchased and paid cash for $92,000 of such stock.

OPINION.

TRUSSELL: The taxpayer claims that the sulphite mill at Battle Island had on May 10, 1916, a true value of at least $300,000, and that it is therefore entitled to have the benefit of a paid-in surplus of $250,000 under the provisions of section 326 (a) (2) of the Revenue Act of 1918, which provides for the inclusion in invested capital, among other things, of

Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus * * *.

It appears from the record of this case that the Battle Island Mill property, constructed in the year 1901, together with additions and improvements made up to July, 1914, had cost, together with the land upon which it was located, $397,794.13; that in July, 1914, its owner had become bankrupt, that on November 27, 1915, the trustees in bankruptcy sold the property for $35,000, and that thereafter, on December 24, 1915, the purchaser at the trustees' sale sold the prop-

erty for $50,000. We have held in the *Appeals of Markenheim Co.*, 1 B. T. A. 1240, and *Pittsburgh Grinding Wheel Co.*, 2 B. T. A. 712, that prices received for property sold by receivers or trustees in bankruptcy or under mortgage foreclosure are not necessarily a measure of the true or fair value of such properties, and that for establishing the invested capital of a taxpayer the true values of such properties may be determined upon the basis of other evidence.

It is also shown in this record that the Battle Island Mill had been deprived of its source of power by having the same appropriated by the State of New York for public uses; that the mill had thus been forced into a state of disuse and that at the time of the bankruptcy sale it had remained idle for approximately two years, and that, deprived of its source of power, it was incapable of being used for the purposes for which it was constructed and intended. The record also shows that the last named purchasers had been able to arrange for the restoration of power and thus again to restore the property to a condition capable of its profitable uses and the taxpayer's claim for the value of $300,000 rests chiefly upon the situation created by the restoration of power privileges. We are not unconscious of the merit of this contention and we find much support for it in such authorities as *Pittsburgh, &c. Ry. Co.* v. *Backus*, 154 U. S. 421; *Boom Co.* v. *Patterson*, 98 U. S. 403; and *San Diego Land & Town Co.* v. *Neale*, 78 Cal. 63; 20 Pac. 372.

We are thus brought to a consideration of the testimony respecting the value and the uses of the property here under consideration. We know what the property had cost, that it had been in use for about 13 years, and that it had remained idle for 2 years, but concerning its condition in May, 1916, the record is silent. Whether all of the construction and machinery and equipment which had entered into the figures of its cost were present in May, 1916, we are uninformed, and the record furnishes us no information respecting the exhaustion, wear and tear which the property had suffered during the years of its use and the years of its idleness.

The taxpayer produced two witnesses who gave opinion testimony concerning the value of the property with power restored. One of these witnesses was the purchaser at the $50,000 sale and the organizer of the taxpayer corporation. The other was a member of an engineering organization engaged in designing and constructing properties of a similar character. We have no doubt that both of these witnesses are qualified, both by education and experience, to testify concerning the values of such property, but their testimony does not convince us of the value claimed. In other cases, notably *Appeal of American Express Co.*, 2 B. T. A. 498, where the Board has accepted opinion testimony of value, the witnesses have given

much detailed information and data in support of their opinions, the like of which is wholly lacking in the record of this case.

While we might have little doubt that this sulphite mill property, in May, 1916, had a value in excess of $50,000, we are unable from the testimony to determine what the amount of that excess might be, and we are, therefore, unable to find with any approximate certainty that the property had an actual cash value substantially in excess of the par value of the stock issued in exchange for it. Judgment must, therefore, be found for the Commissioner.

> *Order of redetermination finding deficiencies for the fiscal years ended April 30, 1919, and 1920, in the amounts of $604.41 and $16,104.74, will be entered.*